THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WASTE ACTION PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>ASTRO AUTO WRECKING, LLC,<br><br>Defendant. | CASE NO. C15-0796-JCC<br><br>ORDER |

This matter comes before the Court on Plaintiff Waste Action Project's motion for partial summary judgment (Dkt. No. 31). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for the reasons explained herein.

I.   BACKGROUND

A. Regulatory Framework

This case arises out of Plaintiff Waste Action Project's (WAP) allegation that Defendant Astro Auto Wrecking (Astro) violated and continues to violate the requirements of its Clean Water Act (CWA) permit. (Dkt. No. 31 at 2.) Congress enacted the CWA in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "A cornerstone of the [CWA] is that the 'discharge of any pollutant' from a 'point source' into navigable waters of the United States is unlawful." *Ass'n to Protect Hammersley,*

*Eld, and Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir. 2002) (quoting 33 U.S.C. §§ 1311(a)). However, a person or company may obtain a National Pollutant Discharge Elimination System (NPDES) permit—which both authorizes and regulates the discharge of pollutants—from either the Environmental Protection Agency (EPA) or an approved state agency. *Id.*; 33 U.S.C. § 1342. In Washington State, the Department of Ecology (Ecology) is responsible for administering the CWA's NPDES program. *Ass'n to Protect Hammersley*, 299 F.3d at 1009–10; 33 U.S.C. § 1342(b); Wash. Rev. Code § 90.48.260.

Ecology implements the CWA's NPDES program through the issuance of "general permits." *Envtl. Def. Ctr., Inc. v. U.S. Envtl. Prot. Agency*, 344 F.3d 832, 853 (9th Cir. 2003). "A general permit is a tool by which EPA regulates a large number of similar dischargers" by identifying "the output limitations and technology-based requirements necessary to adequately protect water quality from a class of dischargers." *Id.* Relevant to this case are Ecology's 2010 and 2015 Industrial Stormwater General Permits (collectively "General Permits").[1]

Central to the General Permits is the development and implementation of a facility-specific Stormwater Pollution Prevention Plan (SWPPP). (Dkt. No. 31-7 at 13; Dkt. No. 31-8 at 10.) The SWPPP is enforceable under the General Permit. *Id.* A requirement of the General Permits is that the "SWPPP shall specify [best management practices (BMPs)] necessary to provide all known, available, and reasonable methods of prevention, control, and treatment." *Id.* The SWPPP must also contain any additional BMPs necessary to prevent discharges that violate water quality standards, as well as several other specific requirements. *Id.* Additionally, because Astro is a vehicle recycling facility, it must implement applicable BMPs contained in the Stormwater Management Manual for Western Washington and Ecology's "Vehicle and Metal Recyclers – A Guide for Implementing the Industrial Stormwater General NPDES Permit (ISGP) Requirements." (Dkt. No. 31-7 at 13, 16; Dkt. No. 31-8 at 10, 13.)

---

[1] The 2015 General Permit replaced the 2010 General Permit and the two iterations are substantially similar. *See* Dkt. Nos. 31-6 and 31-7.

ORDER
PAGE - 2

**B. Astro Auto Wrecking's Facility**

Astro operates a 5.15 acre auto wrecking, recycling, and storage facility in a residential area in Western Washington. (Dkt. No. 1 at 4.) As part of its typical activities, Astro processes, dismantles, drains, stores, and crushes vehicles. (Dkt. No. 35-2; Dkt. No. 34 at 7–9.) The facility is comprised of a shop with indoor repair areas and two roofed but open air vehicle bays, an outdoor car crusher, auto fluid storage areas, scrap piles, and crushed or scrapped car storage. (Dkt. No. 34 at 6; Dkt. No. 33-4.) The facility is almost entirely bare soil. (Dkt. No. 34 at 6.) The facility's western property line runs along the top of a ravine. (*Id.* at 11.) At the bottom of the ravine is the east fork of Hylebos Creek, which is a tributary to the Hylebos Waterway and Commencement Bay. (*Id.* at 11, 15; Dkt. 36 at 4–6.)

Following an investigation in 2008, Ecology "strongly recommended" that Astro make installing a stormwater containment and treatment system its highest environmental priority. (Dkt. No. 31-1.) Relative to other similar vehicle recyclers in Washington, Ecology ranked Astro in the highest category for risk to human health and/or the environment. (Dkt. No. 31-5.) The City of Federal Way also investigated the facility between 2008 and 2010, which resulted in Ecology issuing Astro a General Stormwater NPDES permit. (Dkt. No. 31-9.) The consultant Astro hired to deal with these issues, Mr. Steven Neugebauer, advised Astro that the stormwater on site was nonpoint-source flow, not a point-source discharge, and thus not subject to regulation under the CWA. (Dkt No. 57 at 5–6.) Astro appealed its permit to the Pollution Control Hearings Board. (*Id.*) Astro eventually dropped the appeal, and the propriety of the permit is not at issue in this case. (Dkt. No. 56 at 2; *see also* Dkt. No. 1.) In April 2011, Astro submitted its SWPPP. (Dkt. No. 54.)

In March 2015, WAP provided the required "reasonably specific" notice of intent to sue regarding Astro's alleged General Permits violations. (Dkt. No. 1-1 at 13–24.) After waiting the necessary 60 days to allow Astro to remedy the violations, WAP initiated this lawsuit, alleging that Astro was in violation of several General Permit requirements. (Dkt. No. 1.) WAP now

moves for partial summary judgment. (Dkt. No. 31.) WAP first asks this Court to find that it has standing to maintain suit. (*Id.* at 4.) WAP also asks this Court to find Astro liable for the following CWA NPDES permit violations:

(1)  Failure to implement several specific and basic pollution controls required by Astro's General Permit;

(2) Violation of the reporting requirements;

(3) Violation of the corrective action requirements; and

(4) Violation of the copper effluent limit.

(*Id.* at 3.)

## II.    DISCUSSION

### A.    Summary Judgment Standard

The Court shall grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and that the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court views the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

### B.    Standing

"The [CWA] explicitly allows private citizens to bring enforcement actions against any

person alleged to be in violation of federal pollution control requirements," including the conditions of an NPDES permit. *Ass'n to Protect Hammersley*, 299 F.3d at 1012; 33 U.S.C. §§ 1365(a) and (f); *see also Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("The plain language of CWA § 505 authorizes citizens to enforce *all* permit conditions.") (emphasis in original). In order to maintain a citizen suit, the plaintiff must have standing and provide the defendant with pre-suit notice. 40 C.F.R. § 135.2; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174–75 (2000). Additionally, the alleged violations must be ongoing. *Gwaltney of Smithfield, Ltd. V. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 64 (1987).

        i.        Article III Standing Requirements

To satisfy the standing requirements of Article III, a plaintiff must show (1) it has suffered an "injury in fact"; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *Laidlaw*, 528 U.S. at 180–81. An organization may bring suit on behalf of its members if the interests at stake are germane to the organization's purpose and the claims and relief requested do not require the members' individualized participation, as is the case here. *Id.* at 181; Dkt. No. 36 at 1–2.

The injury in fact requirement in environmental cases is satisfied if an individual shows an aesthetic or recreational interest in a particular place and that those interests are impaired by reasonable concerns over a defendant's conduct. *Ecological Rights Foundation v. Pac. Lumber Co.*, 230 F.3d 1141, 1147, 1151 (9th Cir. 2000). A plaintiff is not required to "show there has been actual environmental harm." *Id.* at 1151.

The areas in question here are Commencement Bay, Hylebos Creek, and its seasonal feeder stream, east fork Hylebos Creek. Plaintiff has provided several declarations of its members expressing concerns that Astro's activities are polluting Hylebos Creek. Defendant responds that "a plaintiff claiming injury from environmental damage must use the area affected

by the challenged activity and not an area roughly in the vicinity of it." (Dkt. No. 54 at 12 (*quoting Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 397 (4th Cir. 2011)). Astro argues that because its facility is miles from Hylebos Creek, and because Plaintiff has not made a "substantive demonstration that the challenged activity is affecting" Hylebos Creek, it has not demonstrated an injury. *Id.* This argument misunderstands the law and ignores the fact that many declarants reported an oily sheen on the water discharged by Astro along with a petroleum smell. (Dkt. Nos. 33 and 37.)

Plaintiff does not have to prove Hylebos Creek has been harmed in order to have standing. Further, if the allegation is that pollutants from Astro are making their way into a feeder stream of Hylebos, it is reasonable to be concerned that they would be transported to Hylebos Creek. Plaintiff has demonstrated a sufficient injury in fact. As to the remaining elements, the injury is traceable to the challenged conduct and is redressable by enjoining Astro from violating the CWA and its permits and imposing civil penalties as a deterrent. Plaintiff therefore has Article III standing.

        ii.     <u>Notice requirement</u>

Prior to bringing suit under the CWA, a plaintiff must provide "reasonably specific" notice of its intent to sue at least 60 days before filing suit. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2. The notice "shall include sufficient information to permit the recipient to identify" the alleged violation in order to allow it to correct the violation and avoid suit. 40 C.F.R. § 135.3(a); *Gaston Copper*, 629 F.3d at 400. Here, the Plaintiff's letter provided "reasonably specific" notice. It outlined exactly which permit conditions it believed Astro to be violating. (Dkt. No 1 at 13–24.) WAP satisfies the notice requirement.

        iii.    <u>Ongoing violation</u>

A court has jurisdiction over a citizen suit under the CWA only when it is "based on good-faith allegations of a defendant's ongoing violation of the Act." *Gwaltney*, 484 U.S. at 64. The allegations here are that Astro has violated and continues to violate provisions of its NPDES

permit. (Dkt. No. 31 at 34.) Plaintiff has submitted multiple declarations demonstrating violations after the date the complaint was filed. As such, this Court has jurisdiction over this citizen CWA suit.

### C. Failure to Implement Pollution Controls

Plaintiff argues that Astro has not implemented several of the specific and basic BMPs required by (1) the General Permits, (2) Astro's own SWPPP, and (3) Ecology's Vehicle and Metal Recyclers ISGP compliance guidance document.[2] (Dkt. No. 31 at 16.) WAP alleges that Astro failed to implement the following BMPs: (1) bermed concrete containment pad for the vehicle crusher, (2) secondary containment for fluid storage, (3) cover and containment for waste and scrap piles, (4) grading and containment pads to reduce pollutant exposure, (5) contaminated stormwater conveyance and treatment BMPs, (6) stormwater recycling system, and (7) keeping hoods closed on stored junk vehicles. (Dkt. No. 31 at 16–19.) Plaintiff provided evidence of all of the above implementation failures. (Dkt. Nos. 31-2, 32, 33, 34, and 35 at 13, 20.)

Astro does not dispute the specific contentions of Plaintiff, but rather counters by arguing that (a) "even if there were any discharge" from the facility, "such a discharge is a nonpoint source, and thus not regulated by the CWA," (Dkt. No. 54 at 15), (b) Astro is a commercial, not industrial, facility, and the guidance documents will not work with non-pointsource flow, (*Id.* at 16), and (c) section S3.4.b. of the General Permits allows for "equally effective" BMPs, which are already in place (*Id.* at 16–17).

Astro's first two arguments are misplaced. Astro has a CWA required NPDES permit for stormwater "discharge[s] associated with industrial activit[ies]." 33 U.S.C. § 1342(p)(3)(A); 40 C.F.R. 122.26(a)(ii); Dkt. Nos. 31-7 and 31-8. Plaintiff's lawsuit alleges that Astro has violated numerous permit conditions. Ecology already determined that Astro requires a permit. (Dkt. No. 31-2 at 8–9.) Astro appealed that determination but ultimately withdrew its appeal. (*Id.*)

---

[2] (2) and (3) are made enforceable by the General Permits. (Dkt. No. 31-8 at 10–11; Dkt. No. 31-7 at 14–15.)

Furthermore, listed among the facilities Ecology requires to have an industrial stormwater permit are "[r]ecycling facilities involved in the recycling of materials included but not limited to, metal scrap yards, battery reclaimers, salvage yards, auto recyclers, and automobile junkyards." (Dkt. No. 31-7 at 8.) Astro's defense appears to be a challenge to its permit, not to Plaintiff's specific allegations of permit violations. To that extent, Ecology's decision to issue Astro an industrial stormwater permit is not subject to collateral attack in this proceeding. *Gen. Motors Corp. v. Envtl. Protection Agency*, 168 F.3d 1377, 1382–83 (D.C. Cir. 1999). As such, Astro's first two arguments fail.

Astro's third argument—that it has equally effective BMPs in place, which is authorized by the General Permits—has some merit. Under § S3.B.4.b., Astro "may omit individual BMPs if site conditions render the BMP unnecessary, infeasible, or [Astro] provides alternative and equally effective BMPs" and clearly justifies them. The consultant Astro hired to implement the General Permits, Mr. Neugebauer, submitted a declaration stating that the berm and trench system currently in place is just as effective as the BMPs from the guidance documents and the SWPPP. (Dkt. No. 54 at 16; Dkt. No. 57 at 11–12.) Taken in the light most favorable to Astro, this creates a disputed material fact as to whether Astro failed to implement (1) a bermed concrete containment pad for the vehicle crusher, (3) cover and containment for waste and scrap piles, (4) grading and containment pads to reduce pollutant exposure, and (5) contaminated stormwater conveyance and treatment BMPs. Accordingly, Plaintiff's motion for summary judgment as to the foregoing is DENIED.

However, Plaintiff's motion for summary judgment as to the failure to implement (2) secondary containment for fluid storage, (6) a stormwater recycling system; and (7) keeping hoods closed on stored junk vehicles, is GRANTED. The Court finds Astro liable for failing to implement secondary containment for fluid storage form the day Ms. Cynthia Hickey, Senior Stormwater Engineer for the King County Department of Natural Resources, inspected the facility on March 18, 2015. (Dkt. No. 32 at 2–3.) The Court finds Astro liable for the failure to

implement a stormwater recycling system from October 31, 2015, the date by which it was to be installed. (Dkt. No. 31-2 at 15–16.) The Court finds Astro liable for failing to keep the hoods closed on stored junk vehicles from the day Plaintiff visited the site, September 1, 2015.[3]

### D. Reporting Requirement Violations

Plaintiff moves for summary judgment on Astro's chronic violation of "the reporting . . . requirements of the NPDES permit that are central to adequate administration and enforcement of limits on substantive discharges under the Clean Water Act" (Dkt. No. 31 at 19 (quoting *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1115 (4th Cir. 1988)). Specifically, Plaintiff claims that Astro failed to (1) submit detailed discharge monitoring reports (DMRs) in 15 quarters, (2) sample stormwater discharges, (3) indicate its compliance status on monthly inspection reports, (4) prepare reports of noncompliance and remedial actions, and (5) submit accurate annual reports in 2011 and 2014. (Dkt. No. 31 at 20–21.)

#### i. Failure to submit DMRs

Plaintiff alleges that Astro failed to submit quarterly DMRs in 15 quarters since 2010. (Dkt. No. 31 at 20.) Astro provided paper copies of all its DMRs from 2010 onward to the Plaintiff; however 15 of those reports are missing from Ecology's Permit and Reporting Information System (PARIS) database. (Dkt. No. 35 at 3.) Astro maintains they were submitted to Ecology. (Dkt. No. 56 at 3.) Taken in the light most favorable to Astro, and considering the DMRs were maintained and given to opposing counsel, there is a question of fact as to whether the 15 DMRs missing from PARIS were in fact submitted to Ecology. Plaintiff's motion for summary judgment on a failure to submit DMRs is DENIED.

#### ii. Failure to sample stormwater discharge

Plaintiff next alleges that Astro failed to sample stormwater discharge during working

---

[3] Plaintiff states that Astro has not changed its practices, (Dkt. No. 31 at 19), yet cites to a portion of the deposition—Dkt. No. 31-2 at 77–78—that was not provided to the Court. However, the allegation is undisputed and corroborated by photos in Dkt. No. 33-4.

ORDER
PAGE - 9

hours in the first and fourth quarters of 2015 and the first quarter of 2016, which violates the 2015 permit. (Dkt. No. 31 at 20.) Plaintiff submitted declarations and video evidence of these discharges, including water flowing under the fence at the south end of the property and down the embankment to East Hylebos Creek. (Dkt. Nos. 31-3, 31-5, 32 at 3–5, 33 at 2–3, 34 at 31–32.) Astro argues that "Mr. Neugebauer's report demonstrates that no discharges occur on this property and the alleged 'discharges' are nothing more than rainwater falling on the outside of Astro's berm." (Dkt. No. 54 at 18.) At the least, it argues, it is a question of fact as to whether there were discharges. (*Id.*) Assuming that there is a question of fact, given the evidence submitted by Plaintiff, no reasonable juror could conclude that these were not discharges. Because the evidence clearly demonstrates there were discharges in three quarters, for which no samples were taken, Plaintiff's motion for summary judgment as to the stormwater discharge sampling requirement is GRANTED.

        iii.      <u>Compliance status</u>

Plaintiff alleges that Astro failed to indicate its compliance status on its monthly inspection reports. (Dkt. No. 31 at 20–21.) Astro does not dispute that it failed to do so, but rather argues that because it filled out the report, whether it checks the box for compliance or non-compliance is irrelevant. (Dkt. No. 54 at 18–19.) Section S7.C.1.c. specifically states the inspector and the permittee must indicate—here by checking a box—whether the facility is in compliance or not. (Dkt. No. 31-7 at 35; Dkt. No. 31-8 at 34–37.) Astro did not do this on 40 reports. (Dkt. No. 35-13.) Accordingly, Plaintiff's motion for summary judgment as to failure to indicate compliance status on 40 monthly inspection reports is GRANTED.

        iv.      <u>Failure to prepare reports of non-compliance</u>

On 26 of Astro's monthly inspection reports, it indicated that it was out of compliance with the General Permit. (Dkt. No. 35 at 2; Dkt. No. 35-3.) Twenty-one of those reports did not describe planned remedial actions to bring the facility back into compliance. (*Id.*) This is in violation of S7.D. and S9.E. (Dkt. No. 31-7 at 35, 40–41.) Plaintiff moves for summary

ORDER
PAGE - 10

1  judgment on those 21 failures to report remedial action plans. (Dkt. No. 31 at 21.) Astro counters
2  by arguing that Plaintiff "ignores data" because on one of the reports, a remedial action plan is
3  included. (Dkt. No. 54 at 19.) However, Plaintiff does not assign a violation to the five reports
4  which contain remedial action plans. (Dkt. No. 31 at 4.) Therefore, Plaintiff's motion for
5  summary judgment as to Astro's 21 failures to prepare reports of non-compliance and remedial
6  actions is GRANTED.

         v.    <u>Inaccurate annual reports</u>

8  Finally, Plaintiff alleges that Astro failed to include in its annual report the conditions
9  necessitating corrective action and the corrective actions it has taken or will take for 2011 and
10 2014. (Dkt. No. 31 at 21.) This is required under § S9.B. Astro does not contest this violation.
11 Accordingly, the Court GRANTS Plaintiff's motion for summary judgment as to the annual
12 reporting violations.

    **E.**    **Corrective Action Requirement Violations**

14 In 2011, Astro exceeded benchmarks for copper, turbidity, lead, zinc, and total petroleum
15 hydrocarbons (TPH). (Dkt. No. 35-10.) In 2014, Astro exceeded benchmarks for turbidity. (Dkt.
16 No. 35-11.) Based on these results, Astro was required to inspect the facility for pollution
17 sources, identify additional BMPs, report remedial actions to Ecology, and summarize the
18 corrective actions in its annual report. (Dkt. No. 31-7 at 36; Dkt. No. 31-8 at 37–38.) Astro does
19 not dispute that it did not do this. Accordingly, the Court GRANTS Plaintiff's motion for
20 summary judgment as to the corrective action requirements in 2011 and 2014.

    **F.**    **Copper Effluent Limit Violation**

22 Finally, Plaintiff argues that Astro has exceeded the allowable copper effluent limitation,
23 in violation of the General Permits. (Dkt. No. 31 at 23.) The limitation for copper is 2.7 parts per
24 billion. (*Id.*) In 2011, the sample tested contained a copper concentration of 36 parts per billion,
25 more than 13 times the limit. (Dkt. No. 35-10.) The only other sample tested for copper, taken in
26 2014, shows a concentration of .054 parts per billion. (Dkt. No. 35-11.) Plaintiff's expert, Dr.

Horner, believes this is a mistake because .054 parts per billion would be undetectable and posits 5.4 parts per billion is the more likely result. (Dkt. No. 34 at 16.) Because Astro made very few, if any, changes between 2011 and 2014, Dr. Horner opines that "Astro is very likely discharging stormwater that violates the copper effluent limit." (Dkt. No. 31 at 23.)

Astro maintains that because the 2014 sampling shows copper levels under the effluent limit, and because Plaintiff has not done any sampling of its own, this is not an ongoing violation, and therefore not subject to enforcement under the CWA. (Dkt. No. 54 at 17.)

Although the Court remains skeptical of Astro's copper reading of .054 parts per billion, when taken in the light most favorable to Astro, it creates an issue of material fact as to whether there is an ongoing violation of § S6.C. for exceeding the copper effluent limitation. Without any independent testing, Dr. Horner's opinion that it is very likely Astro is discharging stormwater with high levels of copper—although admissible—is not enough to grant summary judgment in Plaintiff's favor. Plaintiff's motion for summary judgment on exceeding the copper effluent limit is DENIED.

### III.   CONCLUSION

For the foregoing reasons, Plaintiff WAP's motion for partial summary judgment (Dkt. No. 31) is GRANTED in part as to:

(1) Standing to bring suit, including fulfillment of the notice and ongoing violation requirements,

(2) Failure to implement the BMPs of a secondary containment for fluid storage from May 18, 2015 onward, a stormwater recycling system from October 31, 2015 onward, and keeping the hoods closed on stored junk vehicles from September 1, 2015 onward,

(3)  Failure to sample stormwater discharge in the first and fourth quarters of 2015 and the first quarter of 2016,

(4) Failure to indicate compliance status on 40 monthly inspection reports,

     (5) Failure to prepare 26 reports of non-compliance and remedial actions,

     (6) Failure to prepare accurate and complete annual reports in 2011 and 2014, and

     (7) Failure to fulfill corrective action requirements in 2011 and 2014.

Plaintiff's motion for summary judgment (Dkt. No. 31) is DENIED in part as to:

     (1) Failure to implement BMPs for a bermed concrete containment pad for the vehicle crusher, cover and containment for waste and scrap piles, grading and containment pads to reduce pollutant exposure, and contaminated stormwater conveyance and treatment,

     (2) Failure to submit DMRs in 15 quarters, and

     (3) Violation of the copper effluent limits.

DATED this 6th day of December 2016.

                                                                                       */s/ John C. Coughenour*
                                                                                       John C. Coughenour
                                                                                       UNITED STATES DISTRICT JUDGE