THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WASTE ACTION PROJECT, <br><br> Plaintiff, <br><br> v. <br><br> ASTRO AUTO WRECKING, LLC, <br><br> Defendant. | CASE NO. C15-0796-JCC <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter was tried to the Court from February 27, 2017, to March 2, 2017. The claim presented for adjudication was whether Defendant Astro Auto Wrecking was in violation of sections 301(a) and 402 of the Clean Water Act (CWA), 33 U.S.C. §§ 1311(a) and 1342, for failing to comply with the terms and conditions of its National Pollutant Discharge Elimination System (NPDES) permits. After the bench trial and pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law:

**I.    FINDINGS OF FACT**

1. This is a Clean Water Act (CWA) citizen lawsuit in which Plaintiff Waste Action Project (WAP) alleges that Defendant Astro Auto Wrecking (Astro) violated and continues to violate federal law by failing to comply with numerous provisions of its NPDES permit.

2. Plaintiff Waste Action Project is a non-profit corporation organized under the laws of the State of Washington. It is a membership organization dedicated to protecting and

1       preserving the environment of Washington State, especially the quality of its waters.

2   3.  Defendant Astro Auto Wrecking operates a 5.15 acre auto wrecking, recycling, and
3       storage facility in Western Washington, at 37307 Enchanted Parkway South, near Federal
4       Way, Washington. The facility comprises a shop with indoor repair areas and two roofed
5       but open-air vehicle bays, a mobile outdoor car crusher, auto fluid storage areas, scrap
6       piles, and vehicle storage. The entry to the facility is paved with asphalt, and the roofed
7       vehicle bays are concrete. The other outdoor areas of the facility are bare soil. Some areas
8       are partially covered by quarry spalls. As part of its typical activities, Astro processes,
9       dismantles, drains, stores, and crushes vehicles. Astro has operated the facility since
10      2000.

11  4.  The facility's western property line runs along the top of a ravine. At the bottom of the
12      ravine is the east fork of Hylebos Creek, which is a tributary to the Hylebos Waterway
13      and Commencement Bay of Puget Sound. Testimony at trial established that water flows
14      in the east fork approximately nine months of the year.

15  5.  The east fork of Hylebos Creek is listed as impaired for copper, bacteria, and dissolved
16      oxygen under section 303(d) of the CWA. The copper and bacteria listings are in
17      Category 5, the most advanced classification, indicating that data show violations of the
18      relevant state water quality standard that must be addressed with a total maximum daily
19      load ("TMDL") specification or a water quality improvement project.

20  6.  Plaintiff presented two witnesses who testified that there are known sources of zinc and
21      copper associated with Astro Auto's operations, including automotive chassis, engines,
22      and other metallic vehicle parts handled and stored outdoors, petroleum products which
23      often contain copper additives, brake pads, and tires.

24  7.  The Washington Department of Ecology (Ecology) granted Astro coverage under the
25      Washington Industrial Stormwater General Permit (ISGP) for discharges of stormwater
26      associated with industrial activity from the facility. General permits were issued in 2010

and 2015.

8. Astro completed its first stormwater pollution prevention plan (SWPPP) in April 2011, which was the effective SWPPP for the facility until it was replaced by the May 2015 SWPPP.

9. The statute of limitations in this case extends to March 22, 2010.

10. Waste Action Project satisfied the CWA's pre-suit notice of intent to sue requirement to maintain this case.

11. Prior to trial, the parties stipulated to injunctive relief.

12. On December 6, 2016, this Court issued an order granting in part Plaintiff's motion for summary judgment. The Court held that:

    a. WAP had standing to bring suit, including fulfillment of the notice and ongoing violation requirements,

    b. Astro failed to implement the BMPs of a secondary containment for fluid storage from May 18, 2015, onward; a stormwater recycling system from October 31, 2015, onward; and keeping the hoods closed on stored junk vehicles from September 1, 2015, onward,

    c. Astro failed to sample stormwater discharge in the first and fourth quarters of 2015 and the first quarter of 2016,

    d. Astro failed to indicate compliance status on 40 monthly inspection reports,

    e. Astro failed to prepare 26 reports of non-compliance and remedial actions,

    f. Astro failed to prepare accurate and complete annual reports in 2011 and 2014, and

    g. Astro failed to fulfill corrective action requirements in 2011 and 2014.

13. In that order, the Court declined to grant summary judgment as to Astro's alleged

    a. Failure to implement Best Management Practices (BMPs) of a bermed concrete containment pad for the vehicle crusher, cover and containment for waste and

1     scrap piles, grading and containment pads to reduce pollutant exposure, and
2     contaminated stormwater conveyance and treatment,
3   b. Failure to submit Discharge Monitoring Reports (DMRs) in 15 quarters, and
4   c. Violation of the copper effluent limits.
5  14. The Court's order found Astro liable for at least 1,595 distinct violations of the CWA and
6    left the remaining allegations to be decided at trial.

*Failure to Implement BMPs*

7

8  15. Defendant presented testimony from its expert Mr. Neugebauer, that the berm and trench
9    system he designed was equally as effective as the BMPs required by Astro's SWPPP.
10   However, Plaintiff presented the testimony of Ms. Hickey and Mr. Young, who testified
11   to discharges with an oily sheen and petroleum smell coming from the southern end of
12   the facility.
13  16. Mr. McMilian testified that he believed the water came from the housing development
14    and aggregated on the southern side of Astro's fence. However, given the pictures
15    entered into evidence at trial, and the video showing the water flowing south from under
16    Astro's southern fence, the Court finds it is more likely than not that the water constituted
17    a discharge from the southern end of the facility.
18  17. Mr. McMilian testified that the berm and trench system did not extend to the southern
19    portion of the facility. He testified that he did not extend it to the southern portion of the
20    property because he ran out of money.
21  18. Defendant presented testimony that the oily sheen on the water coming from Astro could
22    have been iron-reducing bacteria, which presents similarly to petroleum on water.
23    However, Plaintiff presented testimony that the water smelled of petroleum. Defendant
24    did not refute this or present testimony that iron-reducing bacteria smell like petroleum
25    products. Combined with the pictures and videos showing an oily sheen, the Court finds
26    that it is more likely than not that the discharges coming from Astro's facility contained

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 4

1    petroleum or petroleum byproducts.

19. The Court further finds that the measures currently in place are not as equally effective as the BMPs required by the SWPPP, specifically (1) a bermed concrete containment pad for the vehicle crusher, (2) cover and containment for waste and scrap piles, (3) grading and containment pads to reduce pollutant exposure, and (4) contaminated stormwater conveyance and treatment BMPs.

*Failure to Submit DMRs in 15 Quarters*

20. Defendant submitted into evidence records of every report that Plaintiff alleged was not filed. Plaintiff's witness from Ecology could not rule out human error in filings before May 2015 and could not explain why, if the reports were sent, Ecology would not have them in the database. The Court finds that Plaintiff did not show it is more likely than not that Astro failed to submit the discharge monitoring reports in 15 quarters.

*Violation of the Copper Effluent Limits*

21. The effluent limit for copper is 2.7 parts per billion.

22. In 2011, Astro sampled a stormwater discharge that contained copper in the amount of 36 parts per billion.

23. The only other sample tested for copper listed a concentration of .054 parts per billion.

24. Plaintiff's expert testified that this was a reporting error because equipment that measures copper in parts per billion would not be able to detect a reading that low. He testified that he thought the actual result was actually 5.4 or 54 parts per billion (both above the effluent limit) but said that was only speculation.

25. Defendant's expert testified that there are laboratories capable of testing for copper measured in parts per trillion, which would be able to explain the reading.

26. Neither side submitted the original lab report into evidence.

27. Neither side testified as to which lab performed the test and if that lab tested for copper in parts per trillion.

28. Plaintiff did not independently test any discharges. The only test results are from 2011 and 2014. The Court finds that Plaintiff did not carry its burden of showing more likely than not that the test result from 2014 was erroneous, or that any subsequent discharge exceeded the copper effluent limit.

*Failure to Sample Discharges in 19 Quarters*

29. Plaintiff submitted evidence demonstrating that any precipitation event equal to or larger than 0.68 inches in 24 hours is sufficient to produce a discharge of stormwater from the facility that can be sampled. The Court finds this evidence credible.

30. Precipitation data from SeaTac International Airport is applicable to the facility and from May 21, 2010 to February 9, 2017, there were at least 115 days with at least 0.68 inches of precipitation measured at SeaTac International Airport.

31. Using that data, the Court finds there were 19 quarters in which there would have been at least one discharge that should have been sampled. Astro did not sample any discharges during those 19 quarters.

*Defendant's Financial Status*

32. Astro has operated at a loss in every year from 2010 to the present.

33. Astro has already expended over $100,000 attempting to comply with its permit.

34. Mr. McMilian testified that the largest fine Astro could sustain and stay in business was $50,000.

35. Plaintiff did not present sufficient evidence to demonstrate Astro financially benefited from its CWA violations.

*Stipulated Injunctive Relief*

36. The following injunctive relief is economically and technically feasible for Astro, in the public interest, appropriate to remedy any Clean Water Action violations WAP alleges considering the balance of hardships between the parties, and within the Court's statutory authority to fashion an appropriate equitable remedy under 33 U.S.C. §§ 1365(a) and (f):

a. Astro will comply with the CWA as it relates to discharges of industrial stormwater from the Facility, all conditions of the ISGP and any successor, modified, or replacement NPDES permit. However, nothing in this stipulation section 36 shall be construed to (i) allow WAP to prosecute allegations of a separate CWA violation as a violation of the injunctive relief rather than as a separate claim; or (ii) prejudice WAP in any separate prosecution of allegations of separate CWA violations at the facility;

b. Not later than March 31, 2018, Astro will install (i) an impervious concrete pad surrounded by a concrete berm for areas where vehicles are processed and/or drained of fluids; (ii) an impervious concrete pad surrounded by a concrete berm for the car crushing area; and (iii) an oil/water separator consistent with the design prepared for Astro by Land Technologies dated April 15, 2011, and stamped by registered engineer Paul Musante;

c. Unless stormwater infiltration proves "*Complicated*" due to soil contamination or groundwater, as that term is defined in subparagraph (d-ii) of this stipulation section 36, Astro will, not later than March 31, 2019, complete installation of stormwater collection, conveyance, and infiltration devices, including a properly engineered infiltration bay, all consistent with the design prepared for Astro by Land Technologies dated April 15, 2011, and stamped by registered engineer Paul Musante;

d. Not later than October 31, 2018, Astro will complete the following testing of the installed improvements:

(i) collect at least eight (8) soil samples from the upper six inches of soil in the area Astro plans to excavate as part of construction of the infiltration bay described in subparagraph (c) of this stipulation. The eight sample locations will be distributed across the area so as to be representative. Astro may composite the eight samples into no fewer than two samples for laboratory analysis. Astro will have such samples analyzed for pH, conductivity, and the metals, organics, and petroleum hydrocarbons listed in Table 8 of condition S6.C.2.e. of the 2015 General Permit. The analysis will be capable of detecting

whether the foregoing pollutants exceed the quantitation levels in Table 8 of the NPDES permit;

    (ii.)    Stormwater infiltration is considered "*Complicated*" for the purposes of this stipulation if (1) any soil sample collected pursuant to subparagraph (d)(i) of this stipulation section 36 exceeds 2015 General Permit thresholds; or (2) groundwater is encountered in the area where Astro Auto plans to construct infiltration facilities;

    (iii.)    If stormwater infiltration at the Facility proves to be Complicated, Astro will notify WAP within fourteen (14) days of receipt of the report or discovery of groundwater that triggers this condition and, within 90 days of providing such notice, will propose and provide to WAP an alternative stormwater treatment system approved by a qualified stormwater professional that will comply with all applicable NPDES permit requirements. Upon joint approval of an alternative treatment system, Astro will install that system no later than May 17, 2019, or, upon joint approval of an alternative infiltration location, Astro will implement the infiltration facilities at the approved location not later than May 17, 2019;

e.  Following each completion date listed in this section, Astro will permit WAP to enter the Facility to verify completion of any of the tasks listed in subparagraphs (a) through (d) of this stipulation section 36, provided that WAP provides a minimum of seven (7) days' written notice of said visit and a mutually agreed time for said visit can be established;

f.  Within six (6) months of completing the tasks listed in subparagraphs (b) and (c) of this stipulation section 36 (and (d) if it becomes applicable), Astro will complete an updated SWPPP and transmit a copy to WAP.

//

//

//

//

//

**II.   CONCLUSIONS OF LAW**

1. The Court has jurisdiction over the parties and the subject matter of this litigation.

2. Venue is properly set in the United States District Court, Western District of Washington pursuant to 28 U.S.C. § 1391, because Astro Auto Wrecking is located in this district.

3. "The citizen plaintiffs in a [CWA] suit are suing as private attorneys general, and they seek enforcement of federal law . . . . Any benefit from the lawsuit, whether injunctive or monetary, inures to the public or to the United States." *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987) (quotations omitted).

4. Plaintiff has standing in this case and complied with the CWA's requirements for maintaining a citizen suit.

*Violations of the CWA*

5. The Court does not accept Astro's affirmative defense that the berm and trench system was equally as effective as the required BMPs.

6. Astro is in violation of sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, for failure to implement the following BMPs required by the SWPPP: (1) a bermed concrete containment pad for the vehicle crusher, (2) cover and containment for waste and scrap piles, (3) grading and containment pads to reduce pollutant exposure, and (4) contaminated stormwater conveyance and treatment BMPs.

7. The failure to implement these BMPs has persisted at least since the date Astro received coverage under the ISGP, May 21, 2010. That is approximately 2,400 days, which constitutes 2,400 violations of the CWA.

8. Astro is in violation of sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, for failure to complete a Level 1 corrective action for oil sheen for the fourth quarter of 2015. This constitutes one violation of the CWA.

9. Astro is in violation of sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and

1342, for failure to sample stormwater discharge for 19 quarters. This constitutes 19 distinct violations of the CWA.

10. Plaintiff did not carry its burden to prove by a preponderance of the evidence that Astro failed to submit discharge monitoring reports for 15 quarters. This claim is dismissed with prejudice.

11. Plaintiff's claim that Astro violated sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, by discharging stormwater containing copper in excess of the effluent limit in its NPDES permit fails and is dismissed with prejudice.

*Remedies*

12. The Court has broad statutory authority to fashion an appropriate equitable remedy under the CWA. *See* 33 U.S.C. §§ 1365(a) and (f). The CWA "permits the district court to order that relief it considers necessary to secure prompt compliance with the Act." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

13. The central purpose of CWA penalties is deterrence—both to the specific violator and generally to the regulated community. *Catskill Mountains Chapter of Trout Unlimited, Inc. v. NYC*, 244 F. Supp. 2d 41, 48 (N.D.N.Y. 2003).

14. The CWA authorizes civil penalties up to $37,500 per day of violation for each violation committed through November 2, 2015, and $51,570 per day of violation for each violation committed after November 2, 2015. 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. § 19.4.

15. Astro is liable for roughly 4,015 violations of the CWA, totaling upwards of $150 million in fines.

16. The Court ORDERS the stipulated injunctive relief outlined in section 36 of the Findings of Fact.

17. Although the CWA authorizes the Court to impose a substantial penalty on Astro, a large penalty will only hamper Astro's efforts to comply with the stipulated injunctive relief

and implement its Land Technology Plan. Further, a substantial penalty will most likely put Astro out of business. Under different circumstances, the Court would not hesitate to impose a substantial penalty for CWA violations; here, however, a substantial penalty will not further the purposes of the CWA.

18. The Court therefore ORDERS a deferred penalty of $50,000. Astro is to use that $50,000 to fulfill the conditions of the stipulated injunctive relief outlined in section 36 of the Findings of Fact. If, by November 2019, Astro has not fulfilled the conditions of the injunctive relief, the Court will impose the $50,000 penalty.

19. The Court retains jurisdiction over this matter to ensure Astro's compliance with the stipulated injunctive relief.

20. Waste Action Project is a substantially prevailing party and entitled to recovery of costs of litigation under 33 U.S.C. § 1365(d).

21. The Court ORDERS Plaintiff to file a detailed accounting of these expenses by April 28, 2017. If Defendant has any objection to this accounting, it must file it by May 12, 2017. Plaintiff's reply, if any, is due by May 26, 2017. If the Court finds Plaintiff's expenses reasonable, it will order Defendant to pay them in full.

DATED this 4th day of April, 2017.

*John C. Coughenour*
John C. Coughenour
UNITED STATES DISTRICT JUDGE